LEONARD BERLIN, Plaintiff-Appellee, *v.* GILBERT NATHAN *et al.*, Defendants-Appellants.

First District (4th Division)   No. 76-1465

Opinion filed September 14, 1978.

Lane & Munday and Benjamin & Shapiro, both of Chicago (William J. Harte, Ltd., of counsel), for appellants Fred Benjamin and Stuart Shapiro.

Charles Locker, of Chicago, for appellants Harriet and Gilbert Nathan.

Wayne B. Giampietro, of Chicago (Joel Edelman and Ligtenberg, DeJong, Poltrock & Giampietro, of counsel), for appellee.

Burditt & Calkins, of Chicago (Richard E. Favoriti and Donald L. Metzger, of counsel), for *amicus curiae.*

Mr. JUSTICE ROMITI delivered the opinion of the court:

This case involves another of the many retaliatory actions which physicians in Illinois and other States who have been sued for malpractice are filing against both the original plaintiff and the original attorney. In this case the original plaintiff's husband was sued as well. In accord with the other cases in Illinois and elsewhere, we hold that the complaint, which failed to allege either malicious intent or special damages, failed to state a cause of action. We also hold that the court correctly dismissed the physician's claim against the husband for barratry.

The pleadings reveal that on October 1, 1973, Harriet Nathan entered the Skokie Valley Community Hospital complaining of an injury to the little finger of her right hand. An X ray was taken under the supervision of Dr. Berlin, a radiologist on the staff of the hospital. Dr. Berlin read the film as revealing a dislocation of the finger. Dr. Meltzer then applied treatment appropriate for a dislocation. In November, another X ray was taken. This X ray disclosed that there had been a chip fracture of that finger.

On September 11, 1975, about two weeks before the statute of limitations would have run, Harriet Nathan, through her attorneys, Benjamin and Shapiro, filed suit against Dr. Berlin, Dr. Meltzer and the hospital alleging various acts of malpractice in the taking of the X rays and the making of the diagnosis. Dr. Berlin thereupon filed a suit against Mr. Nathan (at whose specific instance and request, he alleged, the malpractice suit was specifically brought), Mrs. Nathan and her attorneys Benjamin and Shapiro. In count I of that suit he alleged that all four defendants owed him a duty to refrain from willfully and wantonly bringing suit against him without having reasonable cause to believe that he had been guilty of malpractice; that the defendants instead, although having no cause whatsoever to believe he had been guilty of malpractice, had instituted suit with reckless disregard as to the truth or falsity of the allegations. Specifically, Dr. Berlin in count I complained that Benjamin and Shapiro had acted willfully and wantonly and without probable cause since they had not, before filing suit, obtained an opinion from another physician as to the quality of the X rays and the correctness of their interpretation thereof; and moreover, that the ad damnum ($125,000), which bore no reasonable relationship to the injuries allegedly sustained, was devised to intimidate Dr. Berlin and might affect his ability

to procure malpractice insurance at reasonable rates. Dr. Berlin in count I specifically alleged that Harriet Nathan brought suit willfully and wantonly and without probable cause in that she at no time prior to suit obtained from another physician an opinion as to the quality of the X rays, the correctness of their interpretation or an opinion whether the condition of which she complained resulted from malpractice by either Dr. Berlin or Dr. Meltzer. Dr. Berlin further alleged that the Nathans had been told by another orthopedic surgeon, prior to the institution of the suit, that no malpractice had occurred but that they willfully and wantonly incited and instituted the suit in retribution for real or imagined discourtesies to them by Dr. Meltzer. Finally, Dr. Berlin complained that as a result of these actions his reputation in his profession had been attacked, he had suffered mental anguish, he had been caused to devote much time to the defense of the malpractice suit and, that because of the institution of the suit, he would be required to pay increased premiums for his malpractice insurance coverage. In count II, Dr. Berlin claimed that Gilbert Nathan, knowing the malpractice suit to have no merit but intending to extort money either from Dr. Berlin or his malpractice insurance company, wickedly and willfully caused the suit to be brought and caused Harriet Nathan to prosecute said suit, contrary to the Illinois barratry statute. Ill. Rev. Stat. 1975, ch. 13, par. 21.

In count III, Dr. Berlin alleged that the attorneys, Benjamin and Shapiro, had a duty to the plaintiff not to file the malpractice lawsuit without reasonable evidence to support the allegations therein since, as attorneys, they were particularly aware of the time and expense that litigation causes and could foresee the harm an unfounded lawsuit could cause to the reputation and mental well-being of a physician; that by filing the complaint without reasonable cause, the attorneys fell below the standard of care required of attorneys in the performance of their professional duties in good faith and in a legal manner and were negligent towards Dr. Berlin.

Count II was dismissed by the trial court upon Gilbert Nathan's motion before trial. This suit was consolidated with the original suit for discovery and for trial.

On May 27, 1976, the original malpractice suit was voluntarily dismissed, with prejudice, on the motion of Harriet Nathan. The action on the countersuit then proceeded to trial. At the close of the trial the jury was not instructed as to the elements involved in a suit for malicious prosecution but were solely instructed as follows: as to count I that the plaintiff claimed that the conduct of the defendants was willful and wanton in that a medical malpractice complaint was filed against him when there was no reasonable cause to believe that such a cause of action existed and that the defendant's act was a proximate cause of his damages

(all of which the defendants denied); as to count II (originally count III) that the plaintiff claimed that he sustained damages while exercising ordinary care and the defendants Benjamin and Shapiro were negligent in filing and prosecuting a lawsuit without taking proper steps to determine that there was reasonable cause to believe any cause of action existed and that this was a proximate cause of his damage (all of which the defendants denied). The jury was also instructed that in filing a lawsuit an attorney must possess and apply the knowledge, skill, care and regard for potential defendants that is ordinarily used and shown by reasonably well-qualified attorneys in the locality. And finally, the jury was instructed that the defendants had a duty before and at the time of the occurrence to refrain from willful and wanton conduct which would endanger the rights of the plaintiff.

The jury found all four defendants guilty of willful and wanton misconduct proximately causing injury to Dr. Berlin and awarded Dr. Berlin $2,000 in compensatory damages and $6,000 in punitive damages.

All the parties have appealed.

## I.

The *amicus curiae* has argued that the jury verdict should be upheld since the jury properly found defendant guilty of malicious prosecution. We disagree since we find that the plaintiff's complaint was not sufficient to state a claim for malicious prosecution against any of the defendants, and the instructions to the jury certainly did not submit a claim for malicious prosecution.

## A.

■■■ Tort litigants, such as the Nathans, may be held liable for malicious prosecution. (25 Ill. L. & Prac. *Malicious Prosecution* §1 *et seq.* (1956).) However, since the law does not look with favor on such suits (*Schwartz v. Schwartz* (1937), 366 Ill. 247, 8 N.E.2d 668; *Carlyle v. Carlyle* (1960), 28 Ill. App. 2d 90, 170 N.E.2d 790; *Lyddon v. Shaw* (1978), 56 Ill. App. 3d 815, 372 N.E.2d 685), there are strict limitations on the availability of such suits. Suits for malicious prosecution cannot be maintained in Illinois unless the plaintiff alleges and proves that the plaintiff in the original tort action acted maliciously and without probable cause. (*T. E. Hill Co. v. Contractors' Supply & Equipment Co.* (1911), 249 Ill. 304, 94 N.E. 544; *Lyddon v. Shaw* (1978), 56 Ill. App. 3d 815, 372 N.E.2d 685); that the prior cause terminated in the plaintiff's favor (*Schwartz v. Schwartz* (1937), 366 Ill. 247, 8 N.E.2d 668; *Lyddon v. Shaw* (1978), 56 Ill. App. 3d 815, 372 N.E.2d 685); and that some special injury not necessarily resulting in any and all suits prosecuted to recover for like causes of action was suffered. (*Schwartz v. Schwartz* (1937), 366 Ill. 247, 8 N.E.2d 668; *Lyddon v. Shaw*

(1978), 56 Ill. App. 3d 815, 372 N.E.2d 685; *Pantone v. Demos* (1978), 59 Ill. App. 3d 328, 375 N.E.2d 480.) It is clear that in this case neither of the last two elements was pleaded and, even if we liberally construe the complaint to allege that the suit was brought maliciously and without probable cause by the Nathans, that issue was not submitted to the jury.

B.

■■ Special damages as defined by the Illinois Supreme Court in *Schwartz v. Schwartz* are those not necessarily resulting in any and all suits prosecuted to recover for like causes of action. The only damages that Dr. Berlin claimed he suffered are (1) his reputation in his profession has been attacked; (2) he has suffered mental anguish; (3) he has been forced to spend time on the defense; (4) he will be required to pay increased insurance premiums. The first three items of damage claimed are so patently common to all litigation that no discussion is warranted. We agree, moreover, with the Illinois court in *Pantone* that an increase in insurance premiums, while perhaps not a necessary result of the litigation, is, assuming the allegation is anything more than pure speculation, an item necessarily incident to all malpractice cases and not therefore amounting to damages suffered specially by Dr. Berlin as distinct from other physicians who have been defendants in malpractice suits.

The defendant and *amicus curiae* both, however, contend that the requirement of special damages is unreasonable and should be abolished. First of all, we have no authority to overrule the Illinois Supreme Court. (*Chicago Title & Trust Co. v. Guaranty Bank & Trust Co.* (1978), 59 Ill. App. 3d 362, 375 N.E.2d 522.) But in any event, we agree with *O'Toole v. Franklin* (1977), 279 Ore. 513, 569 P.2d 561, and *Ammerman v. Newman* (D.C. App. 1978), 384 A.2d 637, which rejected precisely the same argument. As the latter court stated (384 A.2d 637, 641):

> "Appellant effectively concedes that he has suffered no injury that would not normally occur as a consequence of a malpractice suit, and appears to recognize that the authority in this jurisdiction does not support his claim. He seeks to avoid the application of the rule by arguing that it is inequitable in the context of medical malpractice actions. He contends that the fact that such actions are particularly harmful to the reputations and livelihood of physicians calls for a modification of the rule with respect to them. The purpose of the special injury rule, however, is to strike a balance between allowing free access to the courts for the vindication of rights without fear of a resulting suit, and the undue exercise of such right. *Davis v. Boyle Bros.*, D. C. Mun. App., 73 A.2d 517, 521 (1950). Appellant's argument, if accepted, would upset that delicate balance. The nature of his profession, given its profound

impact on the lives of those with whom he deals, cannot be allowed to insulate him from potential liability. In order to maintain a free access to the courts by persons with grievances who might otherwise be restrained from seeking redress because of their fear of liability should they fail, the special injury rule has consistently been upheld.

The limitation is sound. When disputes reach the litigious stage, usually some malice is present on both sides. Friendly tort suits are not common. Nor is existence or want of probable cause always easy to determine until the event of the litigation is known. Some margin of safety in asserting rights, though they turn out to be groundless and their assertion accompanied by some degree of ill-will, must be maintained. Otherwise litigation would lead, not to an end of disputing, but to its beginning, and rights violated would go unredressed for fear of the danger of asserting them. [*Melvin v. Pence*, 76 U.S. App. D. C. 154, 157, 130 F.2d 423, 426 (1942).]"

### C.

■■ The complaint against the Nathans failed to allege that the malpractice action had been terminated in plaintiff's favor, obviously for the simple reason that it had not been terminated when the complaint was filed, although it was terminated before the counterclaim was actually tried. Nevertheless, if we were to permit such an action under these circumstances, we would create the incongruous situation of permitting the filing of a suit before the cause of action existed or the statute of limitations commenced to run. *Babb v. Superior Court* (1971), 3 Cal. 3d 841, 479 P.2d 379, 92 Cal. Rptr. 179.

### D.

■■ Basically, the complaint against the Nathans merely alleges that their conduct was willful and wanton. Willful and wanton conduct does not amount to malice. (Compare *Myers v. Krajefska* (1956), 8 Ill. 2d 322, 134 N.E. 277.) However, a suit brought for an improper motive may be malicious (*Carlyle v. Carlyle* (1960), 28 Ill. App. 2d 90, 170 N.E.2d 790), and Dr. Berlin did allege that the Nathans brought suit solely in retribution for the real or imagined discourtesies of Dr. Meltzer. But, the plaintiff clearly abandoned any attempt at trial to prove a cause of action against the Nathans for malicious prosecution since in the instructions submitted to the jury, the jury was solely instructed as to willful and wanton misconduct and was not instructed as to the elements of a claim for malicious prosecution. The burden was on the plaintiff to submit the issue (35 Ill. L. & Prac. *Trial* §251 (1958)); having failed to do so he cannot contend on appeal that he had a claim for malicious prosecution. And, in

all fairness to the plaintiff, he has not made such a claim; only *amicus curiae* has done so.

## E.

■■ A suit for malicious prosecution can be brought against an attorney since an attorney cannot always justify himself merely by showing he followed his client's instructions. (*Burnap v. Marsh* (1852), 13 Ill. 535.) If an attorney, acknowledging there is no cause of action, and knowing this dishonestly and for some improper purpose files suit, or even if an attorney merely acts knowing that his client has no just claim and that his client is actuated by illegal or malicious motives, the attorney may be held liable for malicious prosecution. *Burnap v. Marsh* (1852), 13 Ill. 535; Annot., 27 A.L.R.3d 1113, 1129-33 (1969).

However the plaintiff's complaint was totally insufficient to support a claim against the attorneys for malicious prosecution. First, there is no allegation that the attorneys acted maliciously or knew that their client did so. As we noted previously, willful and wanton conduct does not constitute malicious conduct, particularly where, as here, no improper motive of any kind on the part of the attorneys is suggested. Basically, the plaintiff simply complains that the defendants did not get another doctor's opinion before filing suit. But the undisputed facts are that the finger was fractured and that this fracture was not discovered for several weeks. Perhaps more investigation before filing suit would have been prudent, but as the Louisiana court remarked in *Spencer v. Burglass* (La. App. 1976), 337 So.2d 596, 599-600:

> "There are no factual allegations to suggest that when defendant filed his client's suit he knew the allegations were false or that he had a reckless disregard as to whether the allegations were false or not. On the contrary, plaintiff's allegations are to the effect that defendant simply did not know enough about the case at the time he filed it and now in retrospect plaintiff would say this was malice on defendant's part. If that be so many a successful lawsuit would never have been or never would be filed because oftentimes the case comes to the attorney just prior to prescription date and the evidence is not discovered and developed until after the suit is filed. We therefore conclude that the allegation of 'frivolously filing suits' cannot be construed as an allegation of malice.
>
> ❄ ❄ ❄
>
> Finally, there is the allegation that defendant failed to obtain 'competent medical advice,' etc. Does this constitute an allegation of malice? It would seem that an affirmative answer to this query would mean that before the attorney brings a malpractice case to trial he must find a medical person who supports the attorney's

theory or that of his client, who is willing to testify favorably and who is 'competent' by someone's (plaintiff's?) standards. If he finds no such person but he nevertheless, places whatever evidence he can before the court perhaps relying on circumstantial evidence, reasonable inferences and common sense and perhaps realizing that he will probably lose, he runs the risk of having his conduct branded as malicious. When the bald allegation in question is considered in this light it can hardly be construed as one alleging malice. At worst, the allegation is that defendant went to trial with a poor case and got his just desserts, to wit, he lost. If that constitutes malice, the courtrooms are full of malicious attorneys. This we cannot accept."

■■ Furthermore, as we discussed earlier, the complaint was insufficient since no special damages were alleged. And finally, there is no allegation that the malpractice case was terminated favorably to the present plaintiff before the complaint was filed. In fact it is conceded that at the time of filing, the original tort action was still pending. As the court observed in *Lyddon v. Shaw* (1978), 56 Ill. App. 3d 815, 820, 372 N.E.2d 685, 688, to permit the filing of such an action against the attorney prior to the termination of the initial malpractice action "would tend to drive a wedge between the malpractice plaintiff and his attorney; the attorney may be diverted from properly preparing the client's malpractice case by the necessity for readying his own defense to the physician's countersuit, and may, in some cases, even be forced to withdraw from the malpractice action." This we cannot permit.

## II.

It is clear, therefore, that Dr. Berlin's complaint is insufficient to allege a cause of action for malicious prosecution. Indeed, he has not on appeal contended that it is. What he does claim, contrary to the well-established law in Illinois that "a person is not liable for bringing any suit, criminal or civil, * * *, if the court had jurisdiction of the subject matter and the parties, unless he acts maliciously and without probable cause" (*T. E. Hill Co. v. Contractors' Supply & Equipment Co.* (1911), 249 Ill. 304, 310, 94 N.E. 544, 546), is that he should be able to recover against all of the defendants for the willful and wanton filing of a frivolous lawsuit. But *Hill* still represents the state of the law in Illinois. (*Pantone v. Demos* (1978), 59 Ill. App. 3d 328, 375 N.E.2d 480.) Furthermore, since "it takes a 'special injury' to recover for the *malicious* pursuit of an unfounded civil action, it would be incongruous to base a recovery on mere carelessness without the same requirement." (*O'Toole v. Franklin* (1977), 279 Ore. 513, 569 P.2d 561, 566.) Likewise, we agree with the court in *Lyddon v. Shaw* (1978), 56 Ill. App. 3d 815, 372 N.E.2d 685, that the failure to plead the

outcome of the malpractice action would constitute a fatal defect to Dr. Berlin's complaint, even if he were correct in his contention that malicious prosecution is not the sole course of action available to a party who is put to the expense and vexation of defending a baseless lawsuit. The considerations underlying the requirement that a complaint for malicious prosecution plead the favorable outcome of the prior cause are, in effect, broader than the rule itself. Indeed, we hold that permitting the filing of such a complaint against the attorney before the termination of the original suit would be against public policy since it would tend, as we pointed out earlier, to create a conflict of interest between attorney and client.

## A.

Dr. Berlin, however, contends that article I, section 12 of the Illinois Constitution requires the creation of a new cause of action. Section 12 reads as follows:

"Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly."

■■ ■ It is well established in Illinois that section 12, like its predecessor section 19 of article II of the 1870 Illinois Constitution,[1] is "an expression of a philosophy and not a mandate that a 'certain remedy' be provided in any specific form or that the nature of the proof necessary to the award of a judgment or decree continue without modification." (*Sullivan v. Midlothian Park District* (1972), 51 Ill. 2d 274, 277, 281 N.E.2d 659, 662.) So long as some remedy for the alleged wrong exists, section 12 does not mandate recognition of any new remedy. (*Pantone v. Demos* (1978), 59 Ill. App. 3d 328, 375 N.E.2d 480.) As recognized by the court in *Lyddon v. Shaw* (1978), 56 Ill. App. 3d 815, 372 N.E.2d 685, in this type of case one may file an action for malicious prosecution, or perhaps for abuse of process, and even if those two remedies are not applicable, he may, if put to the burden of defending allegations made without reasonable cause, recover attorney's fees under section 41 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 41), by motion in the original action. He may also, though we doubt it is much comfort to the plaintiff, in an appropriate case, be instrumental in the institution of disciplinary proceedings against the offending attorney. Section 12 mandates no additional remedies. (*Pantone v. Demos* (1978), 59 Ill. App. 3d 328, 375 N.E.2d 480.) The mere fact that the relief provided by these remedies is limited (*Cunningham v.*

---

[1] Section 12 made two changes. One was to add protection against invasion of privacy. The other was the substitution of the word "shall" for the words "ought to." However it is clear from the legislative history that the latter change was not "to create any new rights or to limit any rights." 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1491.

*Brown* (1961), 22 Ill. 2d 23, 174 N.E.2d 153), or that the plaintiff is unable to meet the burden of proof required does not dictate the creation of new remedies. The failure to state a cause of action cannot be cured by alleging that the plaintiff should have a remedy as provided in section 12. Constitutional rights are not infringed where an insufficient complaint is dismissed. (*Belmar Drive-In Theatre Co. v. Illinois State Toll Highway Com.* (1966), 34 Ill. 2d 544, 216 N.E.2d 788; *Zamouski v. Gerrard* (1971), 1 Ill. App. 3d 890, 275 N.E.2d 429.) And as observed in *O'Toole v. Franklin* (1977), 279 Ore. 513, 564 P.2d 561 at 565 "it would be ironic to derive a looser test of malicious prosecution from a constitutional guarantee of access to the courts."

## B.

We are not persuaded by the plaintiff's argument that in light of the recent rise in the volume of malpractice litigation, including the filing of frivolous malpractice suits purely for their settlement value, public policy demands the creation of a cause of action to protect the courts from their misuse and the physician from the resulting harm.

First of all, we agree with the court in *Pantone v. Demos* (1978), 59 Ill. App. 3d 328, 375 N.E.2d 480, that it is doubtful that the creation of this new remedy would reduce the amount of litigation; it is far more likely that litigation would be increased since each successful defendant would bring suit against the original plaintiff. (See also *Smith v. Michigan Buggy Co.* (1898), 175 Ill. 619, 51 N.E. 569.) But even if the creation of this new remedy would reduce congestion in the courts, the price the public would have to pay for the benefit is too great. It is the overriding public policy of Illinois that potential suitors must have free and unfettered access to the courts. (*Pantone v. Demos* (1978), 59 Ill. App. 3d 328, 375 N.E.2d 480; *Lyddon v. Shaw* (1978), 56 Ill. App. 3d 815, 372 N.E.2d 685.) The Illinois courts have consistently adhered to the established policy "that courts should be open to litigants for settlement of their rights without fear of prosecution for calling upon the courts to determine such rights" (*Franklin v. Grossinger Motor Sales, Inc.* (1970), 122 Ill. App. 2d 391, 396, 259 N.E.2d 307, 309, *appeal denied* (1970), 44 Ill. 2d 583, *cert. denied* (1971), 403 U.S. 911, 29 L. Ed. 2d 688, 91 S. Ct. 2207), and have never deviated from the philosophy expressed in *Smith v. Michigan Buggy Co.* (1898), 175 Ill. 619, 628, 51 N.E. 569, 571, that:

> "[I]t must be remembered that the courts are open to every citizen; and every man has a right to come into a court of justice and claim what he deems to be his right without fear of being prosecuted for heavy damages. If such actions are allowed, it might oftentimes happen that an honest suitor would be deterred from ascertaining his legal rights through fear of being obliged to defend a subsequent suit, charging him with malicious prosecution."

Thus, our courts have consistently applied, and refused to lessen, the elements necessary in proving a case for malicious prosecution. See *Schwartz v. Schwartz* (1937), 366 Ill. 247, 8 N.E.2d 668; *Smith v. Michigan Buggy Co.* (1898), 175 Ill. 619, 51 N.E. 569; *Lyddon v. Shaw* (1978), 56 Ill. App. 3d 815, 372 N.E.2d 685; *Pantone v. Demos* (1978), 59 Ill. App. 3d 328, 375 N.E.2d 480; *Westphal v. Fridly* (1975), 34 Ill. App. 3d 611, 339 N.E.2d 30; *Franklin v. Grossinger Motor Sales, Inc.* (1970), 122 Ill. App. 2d 391, 259 N.E.2d 307, *appeal denied* (1970), 44 Ill. 2d 583, *cert. denied* (1971), 403 U.S. 911, 29 L. Ed. 2d 688, 91 S. Ct. 2207; *Caspers v. Chicago Real Estate Board* (1965), 58 Ill. App. 2d 113, 206 N.E.2d 787.

■■ While it is true that, as the defendant contends, "no man has a constitutional right to maintain vexatious or harassing litigation" (*Guttman v. Guttman* (1965), 65 Ill. App. 44, 53, 212 N.E.2d 699, 704), nevertheless "[s]ome sort of balance has to be struck between the social interests in preventing unconscionable suits and in permitting honest assertion of supposed rights. These interests conflict because a suit which its author thinks honest may look unconscionable to a jury." (*Soffos v. Eaton* (D.C. App. 1945), 152 F.2d 682, 683; *O'Toole v. Franklin* (1977), 279 Ore. 513, 569 P.2d 561, 564.) Since, as the court in *Lyddon* pointed out, the very purpose of a court of law is to determine whether an action filed by a party has merit, it would be incongruous to hold a party liable in tort for negligently or even wantonly failing to determine in advance that which ultimately only the court can determine.

And as pointed out in *Lyddon v. Shaw* (1978), 56 Ill. App. 3d 815, 822, 372 N.E.2d 690:

> "These considerations apply with equal force, not only to a party litigant, but to his counsel, (see *Spencer v. Burglass* (1976), La. App., 337 S.2d 596), since a litigant's free access to the courts would frequently be of little value to him if he were denied counsel of his choice by a rule which rendered attorneys fearful of being held liable as insurers of the merits of their client's case, and therefore unwilling to undertake representation in close or difficult matters."

See also *Norton v. Hines* (1975), 49 Cal. App. 3d 917, 123 Cal. Rptr. 237.

■■ Indeed, we believe it would be contrary to public policy for us to hold that an attorney has a duty to an intended defendant not to file a weak or perhaps "frivolous" lawsuit since we would be creating an insurmountable conflict of interest between the attorney and the client. The attorney owes a duty to his or her client to present the client's case vigorously in a manner as favorable to the client as the rules of law and professional ethics demand. (*Norton v. Hines* (1975), 49 Cal. App. 3d 917, 123 Cal. Rptr. 237.) When a tort action is brought he has but one intended beneficiary, his client; the adverse party is certainly not an intended beneficiary of the adverse counsel's client. Thus, even in states extending

the attorney's responsibility and liability to intended beneficiaries of the client's conduct, such as intended legatees under a will, no liability to the adverse party sued by the client has been found absent malicious prosecution. *Norton v. Hines* (1975), 49 Cal. App. 3d 917, 123 Cal. Rptr. 237.

### C.

■■ Furthermore, we are not convinced by Dr. Berlin's argument that since the defendant attorneys are officers of the court and can be disciplined by the court, they should be held liable in tort for breach of Disciplinary Rule 7-102 and Ethical Consideration 7-10 of the Illinois Code of Professional Responsibility (1970). First of all, the Code is not "designed solely to prevent the risk of the plaintiff's being piqued at being sued. That would be an oversimplification of the ethical complexities which govern the lawyer's conduct to his client, the court and the public." (*Spencer v. Burglass* (La. App. 1976), 337 So.2d 596, 601.) Secondly, we see no violation of the Code. The provisions relied on by Dr. Berlin read as follows:

> Illinois Code of Professional Responsibility, D.R. 7-102(A)(1) (1970):
>> "* * * a lawyer shall not: (1) File a suit * * * when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another."

> Illinois Code of Professional Responsibility, E.C. 7-10 (1970):
>> "The duty of a lawyer to represent his client with zeal does not militate against his concurrent obligation to treat with consideration all persons involved in the legal process and to avoid the infliction of needless harm."

As we have already noted, plaintiff in his complaint at no time alleged that the defendant attorneys filed the action knowing it would serve merely to harass or maliciously injure another. All he alleged was that they failed to make the investigation he, Dr. Berlin, felt was proper instead of relying on their client's statement. But, to reiterate, "if that constitutes malice, the courtrooms are full of malicious attorneys." (*Spencer v. Burglass* (La. App. 1976), 337 So.2d 596, 600.) And the injunction to avoid infliction of needless harm can hardly be interpreted as an injunction against the filing of weak lawsuits. The attorney is liable if he is guilty of malicious prosecution, that is enough. To create liability only for negligence, for the bringing of a weak case, would be to destroy his efficacy as advocate of his client and his value to the court, since only the rare attorney would have the courage to take other than the "easy" case.

### D.

We are aware that, as Dr. Berlin contends, some doctors are being flooded with lawsuits; that all at least suffer the loss of time, fees, and the

possibility of an increase in insurance premiums, or even the cancellation of their malpractice policies. We are also aware that the cost of the litigation can be great, whether borne by the doctor himself or by his insurance company. As to this latter problem, we note that the legislature has already responded, to a certain extent, since in 1976 it amended section 41 of the Illinois Civil Practice Act which subjects a party pleading false allegations to the payment of attorney's fees, by eliminating the former requirement that the allegations be shown to have been made in bad faith, and substituting a requirement for a lesser showing that the allegations were made "without reasonable cause." (Ill. Rev. Stat. 1977, ch. 110, par. 41; see *Lyddon v. Shaw* (1978), 56 Ill. App. 3d 815, 372 N.E.2d 685.) While we can sympathize with the physician's predicament, as with that of any person who, confronted with an unwarranted and unfounded lawsuit, must still expend time, money and suffer anxiety, nevertheless we feel, as have the other courts which have considered the problem (see Annot., 84 A.L.R.3d 555 *et seq* (1978)),[2] that this, unfortunately, is a price which must necessarily be paid to keep the courts open to the people. It remains a valid truism that "[s]uch ordinary trouble and expense, as arise from the ordinary forms of legal controversy, should be endured by the law-abiding citizen as one of the inevitable burdens, which men must sustain under civil government." (*Smith v. Michigan Buggy Co.* (1898), 175 Ill. 619, 629, 51 N.E. 569, 572.) The importance of free access to the courts demands that this access be maintained even though occasionally some innocent person must suffer.

## III.

■■ While we agree with Mr. Nathan that the claim against him must be dismissed for the same reason it must be dismissed as to the other three defendants, we cannot agree with his contention that he also cannot be held liable because he is not responsible for his wife's conduct. While the Married Women's Act makes it clear that damages for a civil injury committed by a married woman may be recovered from her alone (Ill. Rev. Stat. 1975, ch. 68, par. 4), it does not follow that a husband and wife cannot conspire together to commit a tort or jointly commit a tort. 21 Ill. L. & Prac. *Husband & Wife* §210 (1977).

---

[2] The plaintiff has cited no case where an appellate court has upheld a complaint brought by a treating physician against his former patient or if deceased, the patient's family or the patient's attorneys for the bringing of a tort action against the physician where malicious prosecution has not been shown and this court has found none. *Drago v. Bounagurio* (1978), 61 App. Div. 2d 282, 402 N.Y.S. 2d 250, cited by the plaintiff is not in point. In that case, the court upheld a complaint by a physician who allegedly had never treated the deceased directly or indirectly during the fatal illness and who had been sued simply as a discovery device in order to ascertain where responsibility could be placed. No such flagrant and deliberate abuse of the legal system has been alleged here.

IV.

Dr. Berlin has cross-appealed from the dismissal of count II against Mr. Nathan for barratry. We agree with Dr. Berlin that under certain circumstances an action in tort might lie against a common barrator. After all, it is clear that at common law an action in tort could be brought against one guilty of maintenance (see for example *Fletcher v. Ellis* (Territory of Ark. 1836), 9 F. Cas. 266 (No. 4,863a); *Goodyear Dental Vulcanite Co. v. White* (C.C. S.D.N.Y. 1879), 10 F. Cas. 752 (No. 5,602)), and we see no reason why the same rules should not apply to common barratry. But we agree with the trial court that no action for common barratry could lie under the situation present in the instant case.

At common law, barratry or common barratry was defined as the offense of frequently exciting or stirring up suits and quarrels between others. Barratry did not consist of a single act but of several acts, and it has been stated that at common law at least three acts of a barratrous nature were necessary to commit the offense. (*Lyddon v. Shaw* (1978), 56 Ill. App. 3d 823, 372 N.E.2d 685; *State v. Noell* (1927), 220 Mo. App. 883, 295 S.W. 529; 14 Am. Jur. 2d *Champerty & Maintenance* §19 (1964).) It is the general practice and not the particular act which constitutes the crime of common barratry. (*Commonwealth v. Pray* (1832), 30 Mass. (13 Pick.) 359.) Here even if the conduct of Mr. Nathan could be considered to constitute the stirring up of a single suit or quarrel, it alone was insufficient to constitute common barratry.

Furthermore, as pointed out in *Vitaphone Corp. v. Hutchinson Amusement Co.* (D. Mass. 1939), 28 F. Supp. 526, 530:

> "* * * Blackstone described a barrator in volume 4, p. 125, as 'those pests of civil society that are perpetually endeavoring to disturb the repose of their neighbors and are officiously interfering in other men's quarrels. * * *' Assuming barratry still to be an offense in Maine and Massachusetts, where the activities complained of here took place, it would be difficult to suppose that the vexatious person or collection of persons that are called common barrators can be found to exist under the above described circumstances. There was no purpose on the part of either the distributors or the Bureau to foment suits in order to oppress persons. Commonwealth v. McCulloch, 15 Mass. 227. And, surely, the definition in Blackstone cannot fit persons engaged in protecting their legitimate business enterprises."

We do not believe that this definition can apply to a person trying to protect his legitimate domestic enterprise, that is, his family, any more than it can to one protecting a legitimate business enterprise. Compare also *Milk Dealers Bottle Exchange v. Schaffer* (1922), 224 Ill. App. 411.

■■ ■ Dr. Berlin, however, argues that the codification of the offense into statutory form has abolished the common law offense. Section 26 of division I of the Criminal Code of 1874 (Ill. Rev. Stat. 1975, ch. 13, par. 21) reads as follows:

> "If any person shall wickedly and willfully excite and stir up any suits or quarrels between the people of this state, either at law or otherwise, with a view to promote strife and contention, he shall be deemed guilty of the petty offense of common barratry; and if he be an attorney or counselor at law, he shall be suspended from the practice of his profession, for any time not exceeding six months."

Even if we were to agree with the plaintiff that the statute has abolished the common law offense, an issue we do not rule on, we cannot agree with the plaintiff that a single action runs afoul of the statute. If a statute is enacted which covers an area formerly covered by common law, such statute must be construed as adopting common law unless there is clear and specific language showing that change in the common law was intended by the legislature. (*Proud v. W. S. Bills & Sons, Inc.* (1970), 119 Ill. App. 2d 33, 255 N.E.2d 64, *appeal denied* (1970), 43 Ill. 2d 398.) There is no clear and specific language in the statute indicating that it was intended to be more restrictive than common law. While the statute does refer to *any* suits or quarrels, we do not believe that the word "any" clearly indicates that the stirring up of a single suit or quarrel is sufficient since the statute refers to suits or quarrels in the plural. It is still the law in Illinois that the laws against champerty, maintenance and barratry are aimed at the prevention of multitudinous and useless lawsuits and at the prevention of speculation in lawsuits. *Milk Dealers Bottle Exchange v. Schaffer* (1922), 224 Ill. App. 411.

Furthermore, we note that the trend in the law has not been toward a more rigorous application of the laws against barratry, champerty and maintenance, but the converse. As the court in *Milk Dealers Bottle Exchange v. Schaffer* (1922), 224 Ill. App. 411, pointed out at page 415:

> "While the common-law crime of champerty has not been abolished by statute in this State, the tendency of decisions is to depart from the severity of the old law and at the same time to preserve the principle which tends to defeat the mischief to which the old law was directed, namely, 'the traffic of merchandizing in quarrels, of huckstering in litigious discord.' "

Additionally, it is noted in 14 Am. Jur. 2d *Champerty & Maintenance* §1, at 842 (1964):

> "The doctrines of champerty and maintenance, as known to the common law, arose at an early day in England from causes peculiar to the state of society then existing. Out of the conditions

then existing arose the common-law rule which prohibited the assignment of choses in action and the sale and transfer of land held adversely. The progress of law, enlightenment, and civilization during the past few hundred years has, however, to a large extent obviated the necessity of the stringent rules. In none of the states are the doctrines or laws of champerty and maintenance preserved in their original rigor. In many states they are declared to be obsolete and to have no existence at all; in others they are preserved in a greatly modified form, usually by special statutes. Generally, choses of action are now assignable, and land held adversely may be sold and transferred. Considering the status of society and conditions now prevailing in this country, to transfer a right of action or to maintain the suit of another without having any direct or contingent interest in it will by no means necessarily produce mischief or oppression. Indeed, it may be that such assistance or maintenance will have a tendency to secure rights and promote the ends of justice."

Indeed, we doubt the constitutionality of any statute which could be considered to bar the giving of unsolicited advice by one person to another, without charge, that that person may have a remedy at law and should peruse it, where the first person is not, as was the case in *Ohralik v. Ohio State Bar Association* (1978), 436 U.S. 447, 56 L. Ed. 2d 444, 98 S. Ct. 1912, attempting to obtain remunerative employment for himself as legal counsel. As Mr. Justice Marshall remarked in his concurring opinion in that case, 436 U.S. 447, 473, 56 L. Ed. 2d 444, 464-65, 98 S. Ct. 1912, 1928:

"The provision of such information about legal rights and remedies is an important function, even where the rights and remedies are of a private and commercial nature involving no constitutional or political overtones. See *United Mine Workers v. Illinois State Bar Association*, 389 U.S. 217, 221-223 (1967). See also *United Transportation Union v. State Bar of Michigan*, 401 U.S. 576, 585 (1971)."

And as was pointed out in *In re Primus* (1978), 436 U.S. 412, 432, 56 L. Ed. 2d 417, 434, 98 S. Ct. 1893, 1904-05:

"The First and Fourteenth Amendments require a measure of protection for 'advocating lawful means of vindicating legal rights,' *Button*, 371 U.S. at 437, including 'advis[ing] another that his legal rights have been infringed and refer[ring] him to a particular attorney or group of attorneys * * * for assistance,' *id.*, at 434."

While it is true that both *Primus* and *NAACP v. Button* (1963), 371 U.S. 415, 9 L. Ed. 2d 405, 83 S. Ct. 328, were cases involving "constitutional and political overtones" and that the court in both distinguished the cases

involving private litigation for private gain, serving no public interest, we suspect that the providing of information about legal rights may be on occasion constitutionally protected even where merely private and commercial rights are involved. However, that question is not before us in this case, since, while the defendant, Mr. Nathan, raised the issue in his answer, he has waived it by not raising it on appeal. *Berk v. County of Will* (1966), 34 Ill. 2d 588, 218 N.E.2d 98; Ill. Rev. Stat. 1977, ch. 110A, par. 341(e)(7).

For the reasons previously discussed in this opinion, the judgment of the trial court in favor of Dr. Berlin is reversed and the case is remanded for the entry of an order dismissing the plaintiff's complaint. The judgment on the cross-appeal is affirmed.

Reversed in part and remanded.

Affirmed in part.

JOHNSON, P. J., and DIERINGER, J., concur.