Michael **WILSON** and Kathleen **Wilson, Appellants,**

v.

James P. **HAYES, Appellee.**

No. 89–252.

Supreme Court of Iowa.

Dec. 19, 1990.

David A. Hirsch of Beckman Law Offices, Burlington, for appellants.

D.G. Ribble and Wilford H. Stone of Lynch, Dallas, Smith & Harman, Cedar Rapids, for appellee.

LAVORATO, Justice.

Two doctors brought suit against an attorney alleging malicious prosecution and abuse of process. The claims arose out of a medical malpractice action that the attorney brought against the doctors on behalf of his client. The client claimed that the doctors' negligence resulted in his wife's death. The underlying malpractice suit was eventually disposed of without trial, and this action followed.

After a bench trial the district court dismissed the doctors' petition. The court found that the doctors had not established either claim. We affirm.

I. *Background Facts and Proceedings.*

The district court made detailed findings of facts, all of which we find were supported by the evidence. These facts include the following.

A. *The Principals.*

Dr. Michael Wilson, an orthopedic surgeon, was in private practice in Burlington, Iowa, at the time the medical malpractice action began. He was a shareholder and an employee of Orthopedic & Reconstructive Surgery Associates, P.C. He practiced in Burlington from 1979 to 1985.

Michael graduated from the University of Iowa Medical School in 1975. After completing medical school, Michael entered a four-year orthopedic residency at Mayo Clinic. After Michael finished his residency, he relocated to Burlington where he entered private practice.

Dr. Kathleen Wilson, an internist and a gastroenterologist, was also in private practice in Burlington when the medical malpractice suit began. Kathleen was a

sole practitioner. She is also a graduate of the University of Iowa Medical School. Kathleen completed a three-year residency in internal medicine at Mayo Clinic. Following the residency, Kathleen completed a two-year fellowship in gastroenterology at Mayo. She then moved to Burlington and began her private practice.

Michael and Kathleen are married and were married at the time the medical malpractice suits began. Although the Wilsons had separate practices, they did refer patients to each other.

James P. Hayes is an Iowa City attorney. Hayes represented Namen Rashid in the medical malpractice action that Namen brought against the Wilsons.

Namen is a resident of Fort Madison. Namen brought the medical malpractice action against the Wilsons as the executor of the estate of his deceased wife, Ellen. Before Namen brought the suit, he was Kathleen's patient.

Ellen Rashid had never been Kathleen's patient. But Ellen had been Michael's patient from December 1982 to January 1983.

The Rashids had two adult children, Terry and Carol. Both children consulted with Hayes and Namen about the medical malpractice suit.

### B. *The medical malpractice lawsuit.*

On July 8, 1983, Ellen was involved in an automobile accident. She was taken from the scene of the accident to the emergency room at Fort Madison Community Hospital. At the hospital Ellen complained of pain in her right ankle as well as general body aches. Dr. James Kannenburg examined and treated Ellen in the emergency room. The emergency room medical records note that Ellen had been in an automobile accident and that she had possibly hit her head and lost consciousness.

X-rays taken of Ellen's ankle showed no evidence of a fracture, dislocation, or any pathology involving the bones of the ankle. Ellen was released from the hospital shortly after her arrival with no significant medical instructions.

Even though the hospital x-rays showed no sign of significant injury, Ellen still experienced pain and discomfort in her right ankle from July 8 to July 12. Because of this pain, Ellen tried to make an appointment with Michael on July 12. A staff member at Michael's office, however, told Ellen that she needed a referral from another doctor. Namen called Kathleen's office for a referral. Kathleen's nurse suggested that Namen take Ellen to the Burlington Medical Center emergency room for treatment.

On July 13 Namen took Ellen to the Burlington Medical Center. Emergency records at the medical center list "K. Wilson" as Ellen's family physician. These records also note that Ellen had been in a "2–car–accident 7-8-83" and was experiencing a headache together with pain in her right leg, both arms, neck, and right hand.

At the hospital Ellen was examined and treated by the emergency room physician, Dr. Gundrum. Dr. Gundrum ordered x-rays and diagnosed a contusion of the right ankle, elbow, and base of the cervical spine. Apparently no special treatment was ordered, and Ellen was released.

On the same day of this hospital visit, Ellen and Namen went to Kathleen's office. Neither Ellen nor Namen had a scheduled appointment with Kathleen that day.

Because Namen was Kathleen's patient, she agreed to see them. They went to Kathleen's office where Namen and Ellen explained Ellen's injuries. Namen and Ellen also relayed the information that both emergency room physicians had told them. The couple explained that Ellen had tried to get an appointment with Michael, but she needed a referral.

Kathleen did not have Ellen's hospital x-rays, but she could see that Ellen's ankle was swollen. Kathleen agreed to call Michael's office. Michael's office then made an appointment for Ellen that afternoon. As Namen and Ellen were leaving Kathleen's office, Namen wanted to pay for the visit. He was told there was no charge, but he insisted on paying $17. This amount was less than the charge for a normal office visit.

Michael saw Ellen the same day. He reviewed Ellen's hospital x-rays. He also took a medical history. Michael's records note that Ellen's chief complaint involved pain and swelling in her right ankle. Michael told Ellen this pain would probably subside in two to three days and suggested an ace wrap on the ankle to control the swelling. No other treatment or medications were suggested. Because Kathleen was the referring physician, Michael's office sent her a copy of his report.

On July 27 Ellen suffered a ruptured congenital cerebral aneurysm. Emergency surgery was performed at University Hospitals in Iowa City to repair the rupture. Ellen died on August 5 due to complications following surgery.

Two months after Ellen's death, Namen began discussing a possible medical malpractice lawsuit. He contacted a few local attorneys, but due to conflicts Namen was referred to Hayes.

Namen and his daughter, Carol, met with Hayes on December 20 to discuss a possible lawsuit. Hayes' notes of this first meeting indicate that since Ellen's automobile accident in July she complained of headaches and that she was getting worse. According to the notes, Ellen complained of these headaches to both Kathleen and Michael. Hayes had Namen sign patient waiver forms. Hayes subsequently requested Ellen's medical records from Michael, Kathleen, Fort Madison Community Hospital, Burlington Medical Center, University of Iowa Hospitals and Clinics, and Dr. Kannenburg.

On June 1984 Hayes met with Namen and Namen's son, Terry. At this meeting, father and son told Hayes that Ellen's head was hurting on the day of the car accident. They told Hayes that Namen had called Kathleen's office on July 12 because Ellen was experiencing terrible headaches. They said Kathleen's nurse had referred them to the hospital for x-rays. They also told Hayes that Ellen had specifically told Michael about the headaches but that Michael said there was nothing wrong with her. In his summary of the meeting, Hayes noted that the emergency room records of July 13 showed that Ellen complained of a headache.

Following this meeting Hayes wrote to Dr. Jon Brillman, a board certified neurologist in Pennsylvania. Hayes had worked with Brillman on previous medical malpractice cases. In his letter Hayes summarized the facts as related to him by Namen and his children. Hayes also sent copies of Ellen's medical records. Hayes asked Brillman to determine whether "the orthopedist failed to deliver to Ellen Rashid the expected standard of care under the circumstances." In making this determination, Brillman was asked to assume the facts as stated by the Rashids as true.

Brillman called Hayes with his opinion on August 1, 1984. Brillman based his opinion on the following assumptions: "an automobile accident, a 'black-out,' amnesia, and a primary complaint of severe headaches on the following days." It was Brillman's opinion that an orthopedist

> could not be faulted for not diagnosing or suspecting the aneurysm right after the accident, but if Ellen continued to complain of headaches a physician and an orthopedist presented with such history and complaints should have referred her to a neurologist or ordered a CAT scan, and a failure to do so would constitute a failure to meet the expected standard of care.

Brillman theorized that Ellen had suffered a small rupture of the aneurysm that had caused her to black out and have the accident. Because of this rupture, Brillman thought there was early bleeding that had healed somewhat but had caused the headaches. According to Brillman there probably was a rerupture of the aneurysm on July 27 that ultimately led to Ellen's death. Brillman believed that an investigation of the headaches on July 13 could very well have prevented the rerupture of the aneurysm on July 27.

Brillman agreed to work with Hayes as an expert witness on the case.

After this call, Hayes wrote to Namen and told him what Brillman had said. Hayes then met with Namen and his chil-

dren on August 15, 1984. At this meeting they decided to sue Michael and Kathleen for malpractice.

On October 31 Hayes sent Namen a copy of the proposed petition. In his letter to Namen, Hayes asked Namen to review the petition and to call him with questions, suggestions or changes. The petition was filed on January 24, 1985.

The Wilsons were served on January 25, a Friday. Over the weekend they discussed the lawsuit at length and its implications for their medical practices and their future. By Monday they had decided to end their private practices and enter the military. They made this decision believing that in the military they could practice medicine without fear of personal suits for malpractice. Eventually both did enter the military.

Kathleen filed an answer to the petition on February 7. In it she specifically denied a doctor-patient relationship between Ellen and her. Kathleen's answer also alleged that she never examined, treated, or consulted with Ellen. The answer asserted that Kathleen's only connection with Ellen was to set up an appointment with Michael.

After Kathleen learned that Dr. Brillman was scheduled to be an expert witness, she telephoned him on February 25. Brillman described Kathleen as being "very upset." He in turn was upset by her call. Kathleen described Namen to Brillman as a litigious person who had suffered from emotional problems. She also gave Brillman the details about Ellen's visits to her office and to Michael's office. Kathleen emphasized that Ellen had only complained about her sprained ankle and had never made any complaints about headaches. Brillman responded that if the facts were as she said, no malpractice had been committed and he would not testify.

Brillman's opinion relied heavily on Ellen's alleged complaints of severe and unremitting headaches. Because of Kathleen's call, Brillman reviewed the materials he had received from Hayes. As a result of this review Brillman felt that the records tended to support Kathleen's claim that there had been no significant complaints of headaches. So he decided not to testify.

Still incensed about the lawsuit, Kathleen wrote a letter to Representative Del Stromer, the minority whip of the Iowa Legislature. Her letter detailed the facts about the lawsuit and also disclosed certain medical facts about Namen's mental illness. Kathleen asked Stromer to change Iowa law and make it easier for doctors to sue attorneys for malicious prosecution and abuse of process.

The letter triggered a call to Hayes from William J. Wimmer, the lobbyist for the Association of Iowa Trial Lawyers. Wimmer also sent Hayes a copy of Kathleen's letter to Stromer. After visiting with Wimmer, Hayes realized he was a potential defendant in a suit by the Wilsons.

On March 13 Brillman telephoned Hayes with the news: he would not testify. Brillman told Hayes that after reviewing the records, he concluded there was no evidence of malpractice by the Wilsons. Apparently, Brillman had not reviewed the medical records before giving Hayes his initial opinion by telephone on August 1, 1984. Brillman's decision not to testify was based on a lack of documentation that headaches were a prominent part of Ellen's initial complaints. Without the complaint of headaches, Brillman felt there was no basis for his opinion of an aneurysmal rupture at the time of the accident. The next day Brillman wrote Hayes, documenting what he had told Hayes the day before.

On March 21 Kathleen moved for summary judgment. Kathleen's motion was based solely on a claim that no doctor-patient relationship existed between Ellen and her. Hayes forwarded a copy of the motion to Namen. After reviewing the motion, Namen wrote Hayes and again recounted the events. Namen swore that his version of the facts was true and volunteered to take a lie detector test.

On March 25 Kathleen's attorney wrote to Hayes. The attorney suggested an early deposition of Brillman because the Wilsons felt Brillman would not support a claim of malpractice against either of them.

On March 28 Hayes replied to this letter. Hayes told the attorney the parties should be deposed before the expert so the expert could have the defendants' versions of the facts.

On the same day Hayes wrote Brillman asking for his opinion based on two different sets of facts. Under one set of facts Brillman was asked to assume Ellen had complained to Kathleen and Michael about a violent, unremitting headache. Under the other set of facts Brillman was asked to assume no such complaint had been made.

On March 29 Brillman called Hayes. Brillman told Hayes that Kathleen had called him two days before, "virtually begging him not to hurt her." Brillman told Hayes he would not testify but he would help Hayes find another expert. Brillman suggested Dr. Arthur Taub of Yale University.

Several days later Brillman wrote to Hayes. Brillman related that the medical records showed no sign of an initial aneurysmal rupture and revealed no initial chief complaint of a headache. Based on these records Brillman concluded the Wilsons had committed no negligence. Responding to Hayes' request to assume Ellen's chief complaint to the Wilsons was one of a violent, unremitting headache, Brillman reached a different conclusion. Under this set of facts, Brillman believed the Wilsons should have undertaken further investigation as to the cause of the headache.

On April 5 Hayes filed a resistance to Kathleen's motion for summary judgment. He supported the resistance with affidavits from Rashid and his daughter, Carol. The gist of the two affidavits was that Ellen had suffered severe headaches which she complained of to the Wilsons. Hayes also attached the July 13, 1983, emergency room records listing Kathleen as Ellen's physician.

Kathleen filed additional affidavits in support of her motion for summary judgment. These included one from her office staff and several from personnel at the Burlington Medical Center. In substance these affidavits denied any doctor-patient relationship between Kathleen and Ellen. They also denied that Kathleen had done anything for Ellen except to make an appointment with Michael. Finally, the affidavits denied that Ellen had ever complained of headaches either to the medical center or to Kathleen and her staff. In her own affidavit Kathleen admitted that Namen had paid $17 for the July 13, 1983, office call. However, she asserted that ·Namen paid this amount despite the fact that he had been told there was no charge for the call.

The motion for summary judgment was heard on April 22. Several weeks later Namen, Kathleen, and Michael were deposed. Except as to two points, Namen's deposition virtually corroborated Kathleen's account of the July 13, 1983, office visit: Kathleen's only involvement was to make an appointment for Ellen to see Michael at Namen's request. Namen conceded that Kathleen had not examined Ellen, had not questioned Ellen about her symptoms, had not seen Ellen's x-rays, and had not treated Ellen.

In contrast to Kathleen's account, Namen did testify that Ellen had complained to Kathleen that she was still having terrible headaches. In addition, Namen's version of the $17 payment also differed. According to Namen he asked the receptionist how much the bill was and she presented him with a bill for $17 which he paid.

Kathleen attached portions of Namen's deposition covering these matters to her motion for summary judgment. Hayes requested additional time to respond to Kathleen's motion and this request was granted. Hayes thereafter supplemented the resistance with several affidavits.

Kathleen's motion for summary judgment was sustained on June 17. The essence of the ruling was that no doctor-patient relationship had existed between Kathleen and Ellen. So, according to the ruling, Kathleen "had no relevant duty to Ellen and accordingly could not be liable to her (or to her personal representative) for medical malpractice." In reaching that conclusion the court relied heavily on Namen's admissions in his deposition.

Hayes forwarded the ruling to Namen and suggested that they should get together to discuss a possible appeal.

When Hayes and Namen left the depositions, the two talked about the possibility of settlement. They also talked about releases for everyone, including Hayes, as part of the settlement. Namen was agreeable to the release idea.

Shortly after the depositions and before the summary judgment ruling, Hayes had begun settlement negotiations with the Wilsons' attorneys. The Wilsons were amenable to releasing Namen but not Hayes. The Wilsons' attorney gave Hayes this counterproposal. In turn, Hayes discussed the counterproposal with the Rashids.

By this time Namen had become incensed about Kathleen's letter to Del Stromer. Namen wanted to sue her for disclosing confidential medical information about him to Stromer. After that, Namen was never amenable to settlement.

Hayes met with the Rashids on June 25 to talk about appealing the summary judgment ruling. Namen wanted to appeal. Hayes then appealed and told Namen that he had done so.

After Brillman refused to testify, Hayes set out to find a new expert witness. Hayes contacted at least five doctors. In general, these doctors evaluated the case the same. They all noted the discrepancy between Namen's version and the Wilsons' version. The doctors' opinions generally coincided with Brillman's: if the Wilsons' version was true there was no malpractice; if Namen's version was true, there was.

Because of the problems he was encountering with the experts, Hayes began to realize that a trial would probably be unsuccessful. Hayes tried to convince Namen of this and tried to convince him to settle. Namen refused to budge.

In an August 29 letter to Namen and Namen's children, Hayes told them that the Wilsons' attorneys had made several inquiries about a release and dismissal of the case. Hayes urged settlement because of the difficulty he was having with the experts. He told the Rashids that they should consider this option as "the best alternative at the present time." In this letter Hayes did not refer to his own release.

In response Namen wrote Hayes and suggested that a certain doctor be contacted as an expert. Namen also told Hayes he would not dismiss the suit.

The Wilsons' attorneys made several more attempts to settle the suit to no avail.

Finally, in February 1986, Hayes wrote to Namen suggesting two alternatives: Hayes would assist him in either dismissing the case or in finding him another attorney. In a return letter, Namen said he would never dismiss the case and that he expected Hayes to represent him at trial or to find him another attorney.

In response, Hayes wrote Namen in April requesting payment of $1878 for expenses. Hayes also indicated that pursuing the case to trial would cost Namen $10,000 to $15,000 and that his firm would require Namen to advance $12,500 for future expenses. Finally, Hayes told Namen that if this arrangement was not satisfactory, he intended to withdraw because of the substantial difference between the two concerning the merits of the case.

Namen responded, insisting that Hayes continue with the case. Namen also made some vague threats as to what would happen if Hayes withdrew.

In May Hayes filed a motion to withdraw in Michael's case. Hayes cited the differences between Namen and himself. Hayes also asserted that he had asked Namen to hire other counsel but Namen had failed to do so.

Following a hearing, the court granted Hayes' motion to withdraw, which was formally approved by a written order on June 12, 1986.

Namen apparently never could hire new counsel to take over the case against Michael. Michael then filed a motion for summary judgment in July. Namen did not attend the hearing on the motion which was scheduled for July 23. Namen did, however, inform the court by letter that he wanted the case dismissed.

The district court continued the summary judgment hearing until August 4 at which time Namen appeared in person. At the hearing Namen told the court he wanted to dismiss not only the district court action but the appeal as well. The district court dismissed the action against Michael. The court, however, had no jurisdiction to dismiss the appeal.

Hayes was not aware that Namen wanted to dismiss the appeal. When he found out, Hayes sent Namen an authorization to do so. In the accompanying letter Hayes explained he understood Namen wanted to dismiss the appeal. Namen never responded to Hayes' letter, which was sent September 16.

On September 16 Kathleen filed a motion to dismiss the appeal. She supported the motion with a transcript of the August 4 hearing at which Namen had stated he wanted the appeal dismissed. There was no resistance to this motion. On October 27 this court dismissed the appeal.

### C. *The Malicious Prosecution and Abuse of Process Claims.*

Following the dismissal of both the district court action and the appeal, the Wilsons sued Hayes for malicious prosecution and abuse of process. In this action, they claim that Hayes' conduct in initiating the original lawsuit and then continuing the case constituted malicious prosecution. In addition the Wilsons contend that Hayes committed an abuse of process when he sought a personal release instead of dismissing the lawsuit.

The Wilsons' claims were filed and tried at law to the court. Following trial, the district court filed extensive findings of fact and conclusions of law. The court held that the Wilsons had failed to prove by a preponderance of the evidence the essential elements of each tort.

The Wilsons appealed and Hayes cross-appealed.

As to their malicious prosecution claim, the Wilsons contend that, contrary to the district court's findings, they did establish that Hayes lacked probable cause and therefore acted with malice toward them in initiating and continuing the lawsuit.

The Wilsons also contend they established their claim of abuse of process. They argue that contrary to the district court's findings, Hayes' primary purpose for continuing the lawsuit was to secure a release for himself. They argue that such conduct was improper and constituted an abuse of legal process.

In his cross-appeal Hayes contends the district court erred when it did not sustain his motion for directed verdict. In his motion Hayes had contended that the Wilsons were required to produce expert testimony on lack of probable cause and on whether he properly used legal process. Three organizations have filed Amicus Curiae briefs contending that expert testimony should be required to establish lack of probable cause in a malicious prosecution action against an attorney. These organizations include the Iowa State Bar Association, the Iowa Trial Lawyers Association, and the Iowa Academy of Trial Lawyers.

Our scope of review in actions for malicious prosecution and abuse of process is limited to correction of errors at law. *Royce v. Hoening*, 423 N.W.2d 198, 200 (Iowa 1988) (citing Iowa R.App.P. 4). Findings of fact in jury-waived cases shall have the effect of a special verdict. Iowa R.App.P. 4. We are bound by the trial court's findings of fact if they are supported by substantial evidence. Iowa R.App.P. 14(f)(1). Evidence is substantial when a reasonable mind could accept it as adequate to reach the same findings. *Waukon Auto Supply v. Farmers & Merchants Sav. Bank*, 440 N.W.2d 844, 846 (Iowa 1989).

### II. *The Issues on Appeal.*

### A. *Malicious Prosecution.*

Over the years medical malpractice litigation, for whatever reason, has mushroomed. The medical community has been critical of such suits, suggesting that many are frivolous and brought merely for their settlement value. This feeling has prompted a number of doctors to retaliate by bringing malicious prosecution suits

against either the original patient plaintiff or the plaintiff's attorney. *See Wong v. Tabor*, 422 N.E.2d 1279, 1282–83 (Ind.App. 1981).

Malicious prosecution began as a remedy for unjustifiable criminal proceedings. Gradually the remedy was extended to the wrongful institution of civil suits. *See* W. Prosser, *Law of Torts* § 120, at 889 (Fifth Ed.1984) [hereinafter Prosser]. In fact, the Restatement refers to the civil side of the remedy as the "wrongful use of civil proceedings." *See* Restatement (Second) of Torts, *Wrongful Use of Civil Proceedings*, § 674–681B, at 452–73 (1977). So when applied to civil proceedings, malicious prosecution is actually a misnomer. Prosser § 120, at 892. In our own cases we make no distinction. *See, e.g., Sarvold v. Dodson*, 237 N.W.2d 447, 448 (Iowa 1976) ("The basis of an action for malicious prosecution consists of the wrongful initiation of an unsuccessful civil or criminal proceeding with malice and without probable cause").

■ The remedy's primary purpose is to provide relief in those cases in which a plaintiff brings a meritless suit *and* has an improper motive for bringing it. *Wong*, 422 N.E.2d at 1283. Courts have not favored the remedy and so have construed its requirements strictly against the malicious prosecution plaintiff. *Id.* According to Prosser, two competing social interests underlie the remedy: the individual interest in freedom from unjustifiable litigation and the social interest in supporting resort to the law. Prosser § 119, at 871.

It is only in recent years that litigants have used the remedy against attorneys. One commentator suggests the remedy focuses on the intent of the original plaintiff rather than on the attorney's conduct in screening lawsuits. Note, *A Lawyer's Duty to Reject Groundless Litigation*, 26 Wayne L.Rev. 1561, 1569 (1980). For that reason it is suggested the remedy is ill-equipped to deter attorneys from filing groundless suits. *Id.* at 1568. This in turn may account for the reluctance of the courts to hold attorneys liable for malicious prosecution. *Wong*, 422 N.E.2d at 1283.

We recently summarized the elements of a malicious prosecution suit in a civil setting:

> To prevail on a claim for malicious prosecution, the plaintiff must establish each of the following six elements: (1) a previous prosecution, (2) instigation of that prosecution by the defendant, (3) termination of that prosecution by acquittal or discharge of the plaintiff, (4) want of probable cause, (5) malice on the part of defendant for bringing the prosecution, and (6) damage to plaintiff.

*Royce v. Hoening*, 423 N.W.2d 198, 200 (Iowa 1988); *see also* Restatement (Second) of Torts §§ 674, 681A (setting forth comparable elements).

The fighting issue here concerns Hayes' conduct in initiating and continuing the malpractice action. Specifically, did he have probable cause? And did he act with malice or an improper purpose?

■ While we have addressed the question of probable cause to file suit from a litigant's standpoint, we have not developed a standard for reviewing an attorney's decision to file suit. Such a standard requires a careful consideration of the attorney's duty to the client and freedom of access to the courts:

> [In developing a standard for reviewing a lawyer's decision to file suit], we must be ever mindful that an attorney's role is to facilitate access to our judicial system for any person seeking legal relief. As such, probable cause is not to be judged merely upon some personal assessment of a claim's merit. It must encompass consideration of the law's desire to fully meet the client's needs. While an attorney is under an ethical duty to avoid suit where its only purpose is to harass or injure, if a balance must be struck between the desire of an adversary to be free from unwarranted accusations and the need of the client for undivided loyalty, the client's interests must be paramount....

> We thus emphasize that any standard of probable cause must insure that the attorney's "duty to his client to present his case vigorously in a manner as favor-

able to the client as the rules of law and professional ethics will permit" is preserved....

We recognize that through an effort to protect every citizen's free access to the courts some innocent persons may suffer the publicity, expense and other burdens of defending ill-founded lawsuits. While this is regrettable, the chilling effect that a broad rule of attorney liability would have upon the legal system, and ultimately upon its popular acceptance as a means of dispute resolution, appears to outweigh the value of the protection it would afford to those who might be deemed "innocent" defendants.

*Wong,* 422 N.E.2d at 1285–86; *accord Brody v. Ruby,* 267 N.W.2d 902, 905 (Iowa 1978).

In keeping with this philosophy, the Restatement has formulated a special rule to govern review of an attorney's conduct in commencing and continuing a lawsuit:

An attorney who initiates a civil proceeding on behalf of his client or one who takes any steps in the proceeding is not liable if he has probable cause for his action; and even if he has no probable cause and is convinced that his client's claim is unfounded, he is still not liable if he acts primarily for the purpose of aiding his client in obtaining a proper adjudication of his claim. An attorney is not required or expected to prejudge his client's claim, and although he is fully aware that its chances of success are comparatively slight, it is his responsibility to present it to the court for adjudication if his client so insists after he has explained to the client the nature of the chances.

If, however, the attorney acts without probable cause for belief in the possibility that the claim will succeed, and for an improper purpose, as, for example, to put pressure upon the person proceeded against in order to compel payment of another claim of his own or solely to harass the person proceeded against by bringing a claim known to be invalid, he is subject to the same liability as any other person.

Restatement (Second) of Torts § 674 comment d (1977) (citations omitted). In short, under this rule the attorney avoids liability if the attorney either had probable cause or acted primarily to have the client's claim judicially determined.

The improper purpose element in this rule coincides with the concept of malice and is discussed in section 676 of the Restatement:

*Propriety of Purpose.*

To subject a person to liability for wrongful civil proceedings, the proceedings must have been initiated or continued primarily for a purpose other than that of securing the proper adjudication of the claim on which they are based.

*Id.* § 676.

Comment c to section 676 gives examples of improper purposes: the person bringing suit is aware the claim has no merit; the proceedings are begun because of hostility or ill will; the matter is initiated solely for the purpose of depriving the person against whom it is brought of a beneficial use of property; or, suit is brought for the purpose of forcing a settlement which has no relation to the merits of the claim (a "nuisance" suit).

Our concept of malice for malicious prosecution is set out in *Brown v. Monticello State Bank,* 360 N.W.2d 81, 87 (Iowa 1984):

Malice means any wrongful act which has been wilfully and purposely done to the injury of another. There must be an improper purpose or motive. Malice may be actual, or it may be inferred from a want of probable cause.

Although this definition seemingly coincides with the concept of improper purpose in section 676 of the Restatement, there is one important difference. Under our definition malice may be inferred from a want of probable cause. *Id.* Under section 676 a finding of an improper purpose must be supported by evidence independent of the evidence establishing a want of probable cause. *See Friedman v. Dozorc,* 412 Mich. 1, 56–57, 312 N.W.2d 585, 607 (1981).

The independent evidence requirement stems from the following language in comment d to section 674 of the Restatement:

[E]ven if [the lawyer] has no probable cause and is convinced that his client's claim is unfounded, he is still not liable if he acts primarily for the purpose of aiding his client in obtaining a proper adjudication of his claim.

So the attorney who

"acts primarily for the purpose of aiding his client in obtaining a proper adjudication of his claim," albeit with knowledge that the claim is not tenable, should not be subject to liability on the thesis that an inference of an improper purpose may be drawn from the lawyer's continuing to advance a claim which he knew to be untenable.

*Friedman,* 412 Mich. at 56–57, 312 N.W.2d at 607.

The rule that malice may be inferred from want of probable cause developed in cases in which damages were sought from a lay person. One court suggests that this rule "fails to make sufficient allowance for the lawyer's role as advocate and should not be applied in determining whether a lawyer acted for an improper purpose." *Id.*

Thus, under the Restatement rule as expressed in comment d, an attorney would only be liable if the attorney knowingly initiated or continued a suit for a clearly improper purpose. Filing or continuing a weak case would not be enough. Nor would a failure to fully investigate all the facts prior to suit. So long as the attorney has grounds to support a belief "that bringing a particular action may help to secure a proper adjudication of a claim," no liability would result. *Wong,* 422 N.E.2d at 1287; *see also Friedman,* 412 Mich. at 52–55, 312 N.W.2d at 605–06; 52 Am.Jur.2d *Malicious Prosecution* § 64 (1970) ("Except on proof of his actual knowledge that the charge was groundless, . . . an attorney should not be held liable for the malicious prosecution of a third person if it appears that he acted with the authority of his client, solely in the interest of his client, and without knowledge of fraud, collusion, or sinister intent to injure or deceive the third party").

In determining the existence of probable cause

[t]he important question [is not the defendant's] belief but whether all the facts, as [the defendant] knew them or should have known, were such as to justify the ordinary, reasonably prudent, careful and conscientious person in reaching such a conclusion.

*Schnathorst v. Williams,* 240 Iowa 561, 577, 36 N.W.2d 739, 748 (1949). Stated another way,

there is a want of probable cause if the circumstances are such as to satisfy a reasonable [person] that the defendant had no ground for proceeding but [the] desire to injure the plaintiff.

52 Am.Jur.2d *Malicious Prosecution* § 52, at 218.

■ To establish probable cause, however, "it is not necessary that one be certain of the outcome." *Id.* § 51, at 219. Rather, the test for probable cause is an objective one: probable cause exists if there are reasonable grounds for believing the suit is justified. *Id.* Implicit in this test is the notion that

[t]he conduct of the defendant is to be weighed in view of what appears to the defendant at the time of initiating the prior proceeding . . . .

*Id.* § 64, at 226.

When deciding if a client has probable cause,

an attorney is entitled to rely in good faith upon the statements of facts made . . . by [the] client, and is not under a duty to institute an inquiry for the purpose of verifying [the client's] statement . . . .

*Id.* § 64, at 226–27; *accord Friedman,* 412 Mich. at 52–53, 312 N.W.2d at 605; *Murdock v. Gerth,* 65 Cal.App.2d 170, 179, 150 P.2d 489, 493 (1944).

Probable cause is defined in the Restatement:

One who takes an active part in the initiation, continuation or procurement of civil proceedings against another has probable cause for doing so if he reasonably believes in the existence of the facts upon which the claim is based, and either

(a) correctly or reasonably believes that under those facts the claim may be valid under the applicable law, or

(b) believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge and information.

Restatement (Second) of Torts § 675. A person initiating a civil proceeding cannot have a "reasonable belief in the existence of the facts on which the proceedings are based" if the person knows that the alleged facts are not true. *Id.* at comment d. On the other hand it is enough if the existence of such facts is not certain, but the person believes their existence can be established to the satisfaction of the jury. *Id.*

This definition of probable cause [a]s applied to a plaintiff's lawyer ... would allow lack of probable cause to be found where the lawyer proceeded with knowledge that the claim had no factual or legal basis, but would impose no obligation to investigate if the lawyer could reasonably believe the facts to be as the client alleged.

*Friedman*, 412 Mich. at 55, 312 N.W.2d at 606. We see no practical difference between the Restatement's definition of probable cause as applied to attorneys and the definition of probable cause we spoke of earlier.

■ We think the Restatement's approach to attorney liability for malicious prosecution is sound. So we adopt the rule stated in comment d to section 674 of the Restatement. We also adopt the rule that a finding of an improper purpose must be supported by evidence independent of the evidence establishing a want of probable cause. In other words, in cases of malicious prosecution against attorneys an improper purpose may not be presumed from a want of probable cause. Our rule that malice may be presumed from a want of probable cause remains the same in all other cases.

■ There are a number of reasons why we think this approach is sound. First, we have already mentioned the attorney's duty to facilitate access to the court for any person seeking legal relief and the attorney's duty to vigorously present the client's case. Any broad rule of attorney liability would have a chilling effect on both. As one court wisely noted,

To create liability ... for the bringing of a weak case, would be to destroy his efficacy as advocate of his client and his value to the court, since only the rare attorney would have the courage to take other than the "easy" case.

*Berlin v. Nathan*, 64 Ill.App.3d 940, 953, 21 Ill.Dec. 682, 691, 381 N.E.2d 1367, 1376 (1978), *cert. denied*, 444 U.S. 828, 100 S.Ct. 53, 62 L.Ed.2d 36 (1979).

Second, statute of limitations problems present serious dilemmas to attorneys. There may be only enough time to file suit based on the information the client gives. Should an attorney refuse to handle a case that seems to have merit merely because there is not enough time to investigate and research? These circumstances create a "catch 22" situation for the attorney. The attorney could fail to file and possibly create grounds for legal malpractice. Or the attorney could file and possibly create grounds for a malicious prosecution action.

Third, as one court suggests, whether an attorney acted appropriately in initiating or continuing a suit "should not normally depend upon the extent of the investigation conducted." *Friedman*, 412 Mich. at 52, 312 N.W.2d at 605. The canons of ethics echo this notion. Such canons, for example,

consistently incorporate a requirement of *scienter* as to groundlessness or vexatiousness, not a requirement that the lawyer take affirmative measures to verify the factual basis of the client's position.

*Id.* at, 312 N.W.2d at 605; Iowa Code of Professional Responsibility for Lawyers DR 7–102(A) (lawyer should not file suit when he *knows or when it is obvious* that such action would serve merely to harass or maliciously injure another).

Fourth, oftentimes a case looks good from the start, but as time goes on the case turns sour. This case is a prime example. The attorney in such circumstances may

again be caught in a "catch 22" situation. The attorney usually reaches a point where the client is advised to settle for a nominal amount or dismiss. The client, as in this case, may adamantly refuse and insist upon pressing the claim though the attorney has explained that the case has little chance of success. In these circumstances an attorney's ability to withdraw is curtailed if the client objects. *See Friedman*, 412 Mich. at 57 n. 60, 312 N.W.2d at 607 n. 60. The canons of ethics do allow the attorney to withdraw when the attorney discovers the case has no merit. But the attorney must secure court permission which might not be granted. *See* Iowa Code of Professional Responsibility for Lawyers DR 2–110(A)(1) (lawyer shall not withdraw without court permission); DR 2–110(A)(2) (lawyer may not withdraw until lawyer takes reasonable steps to protect client).

■ Fifth, some courts fear that a conflict of interest may arise between attorney and client if a duty is imposed on the attorney to third parties not to file weak cases. An attorney owes a duty to the client to present the client's case vigorously in a manner as favorable to the client as the rules of law and professional ethics demand. *See Berlin*, 64 Ill.App.3d at 953, 21 Ill.Dec. at 691, 381 N.E.2d at 1376; Iowa Code of Professional Responsibility for Lawyers DR 5–101 (refusing employment when the interests of the lawyer may impair lawyer's independent professional judgment).

Sixth, an attorney's identification with a client is professional, not personal. In this sense an attorney's role does not differ from that in other professional relationships. For example, no reasonable person would impute a patient's conduct to a treating physician. And no reasonable person would levy criticism against a physician for furnishing needed medical services, even when the patient might seek such treatment for injuries resulting from objectionable or even outrageous conduct.

■ Last, we think Iowa Rule of Civil Procedure 80(a) provides an adequate alternative remedy for baseless litigation. Under the rule an attorney's signature on every motion, pleading, or other paper, is a certification that the attorney

> has read [such documents]; that to the best of [the attorney's] knowledge, information, and belief, *formed after reasonable inquiry*, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or cause an unnecessary delay or needless increase in the cost of litigation....

Iowa R.Civ.P. 80(a) (emphasis added).

A violation of Rule 80(a) subjects the offending attorney to sanctions including "the amount of the reasonable expenses incurred because of the filing of [the enumerated documents], including a reasonable attorney fee." *Id.* An attorney who files a suit without first conducting a reasonable investigation may escape liability for malicious prosecution if the suit turns out to be groundless. But such an attorney may incur sanctions under rule 80(a).

With these principles in mind we turn to the record in this case.

1. *Initiating the suit.* There is no dispute between the parties that the malpractice action terminated in favor of the Wilsons. The district court so found and we do not address that issue any further.

■ At this point, as the district court found, the Wilsons had established a prima facie case that probable cause for initiating the suit was lacking. *See Schnathorst*, 240 Iowa at 573–74, 36 N.W.2d at 746. Hayes then had the burden of going forward with the evidence to rebut this presumption. But the burden of persuasion as to *all* the elements of malicious prosecution still remained with the Wilsons. *See id.* The district court found that Hayes had rebutted the presumption. The court also found that the Wilsons had failed to prove by a preponderance of the evidence that probable cause for initiating the suit was lacking.

In reaching its conclusion, the court found that the following critical facts were

known to Hayes when the malpractice action was filed:

(1) Kathleen and Michael had both seen Ellen on July 13, 1983, and both were aware that she had recently been in an automobile accident.

(2) Namen and his children told Hayes that Ellen had been complaining of constant headaches and that Ellen had relayed this fact to the Wilsons.

(3) The July 13, 1983, emergency records list "K. Wilson" as Ellen's physician. These records also show that Ellen was complaining of a headache.

(4) Kathleen's office notes verify Ellen's July 13, 1983, visit and include a brief medical history as well as statements about the hospital x-rays and a diagnosis of Ellen's right ankle injury.

(5) Kathleen's office notes also include a written plan to refer Ellen to Michael.

(6) Kathleen's office records show that Namen paid $17 for Ellen's visit.

(7) Michael's office notes include substantially similar information regarding Ellen's visit to him.

(8) Michael's office notes indicate that he forwarded a copy of his notes, including medical history, diagnosis, and recommended treatment, to Kathleen.

(9) Before filing the lawsuit, Hayes consulted with Brillman, a board-certified neurologist. After reviewing the facts as related by Hayes who in turn relied on the medical records and what the Rashids had told him, Brillman concluded that the Wilsons may have been negligent. Brillman gave Hayes a logical and convincing theory in support of his conclusion.

We think these facts support the district court's conclusion that Hayes had rebutted the prima facie case. These facts also support the court's conclusion that the Wilsons had failed to prove by a preponderance of the evidence that probable cause to initiate the suit was lacking. Hayes had before him the facts according to the Rashids as well as documentary evidence tending to support these facts. Hayes also had the opinion of a qualified expert with whom Hayes had consulted in previous cases.

Given this information, we think a reasonably prudent and careful attorney could conclude that filing the suit was justified.

Because the district court found that Hayes had probable cause to initiate the malpractice action, it held that malice could not be inferred. As to the existence of actual malice, the court ruled that "[n]o other substantial evidence shows or purports to show that Hayes initiated the Rashids' lawsuit with malice."

We agree with the district court's bottom line. However, under the Restatement rule we adopt today, an improper purpose—the counterpart of malice—cannot be inferred from a lack of probable cause. So under this rule, even had the district court found a lack of probable cause, it would need to find from independent evidence that Hayes initiated the suit for an improper purpose. We find no such independent evidence in the record.

That brings us to the question whether there was probable cause to continue the lawsuit and whether there was any malice in doing so.

**2. *Continuing the lawsuit.*** Even though a lawsuit is commenced with probable cause, if the suit is prosecuted after it later appears there is in fact no probable cause, liability may arise. *See* Restatement (Second) of Torts § 674 comment c. According to comment c:

> One who continues a civil proceeding that has properly been begun or one who takes an active part in its continuation for an improper purpose after he has learned that there is no probable cause for the proceeding becomes liable as if he had then initiated the proceeding.

*Id.* In an early case this court recognized this same principle. *See Wetmore v. Mellinger,* 14 N.W. 722, 723 (Iowa 1883), *rev'd on rehearing,* 64 Iowa 741, 18 N.W. 870 (1884).

As in the case of initiating a lawsuit, an improper purpose for continuing one may not be inferred from a lack of probable cause. Such purpose must be established by evidence independent of the evidence establishing a lack of probable cause.

Kathleen contended in the district court, as she contends here, that there never was a doctor-patient relationship between Ellen and her. She argues that at some point early in the proceedings Hayes should have realized this and dismissed the suit against her.

Another contention is based on the assumption that such a doctor-patient relationship existed. Even in these circumstances the Wilsons contend the lawsuit should have been discontinued because it soon became apparent none of the Rashids had complained to them that Ellen was suffering serious headaches. Such a complaint, of course, was an important predicate for an opinion that the Wilsons were negligent. At that point the Wilsons argue Hayes had no probable cause to continue the case against either of them.

The district court found against the Wilsons on both points. The court concluded that they had not established by a preponderance of the evidence lack of probable cause to continue the case. For reasons that follow we agree.

■ a. *The case against Kathleen.* As the district court found, probable cause for the continuation of the case against Kathleen centered on her motion for summary judgment. We agree with the district court that such probable cause depended on whether Hayes had reasonable grounds to dispute the summary judgment ruling. And that depended on whether there was a fact question regarding the existence of a doctor-patient relationship between Kathleen and Ellen. *See* Iowa R.Civ.P. 237(c). Hayes squarely raised this issue in the appeal.

As we earlier noted, the summary judgment record contained affidavits, medical records, and excerpts from Namen's deposition. This record contained conflicting factual information regarding the existence of a doctor-patient relationship. Based on this record we think Hayes had reasonable grounds to believe he could prevail on appeal, the same conclusion the district court reached. In the words of the district court,

Hayes had probable cause to pursue the appeal in that he had knowledge of a state of facts which would lead a person of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice, to believe that pursuit of the appeal was justified. Stated otherwise, the court finds and concludes that the [Wilsons] have not shown by a preponderance of the evidence that Hayes lacked probable cause to believe that a physician-patient relationship existed between Kathleen and Ellen and lacked probable cause to pursue an appeal from an adverse ruling on the motion for summary judgment.

■ b. *The case against both doctors.* The crucial fact in the case against both doctors was whether Ellen had complained of headaches to them. Our recital of the facts found by the district court demonstrates there was a factual dispute on this issue.

The Wilsons, of course, deny that Ellen complained about headaches. Both doctors agree, however, that had she done so, a CAT scan should have been ordered to detect a possible aneurysm.

Namen, on the other hand, claimed that Ellen did complain of headaches to Michael, but that Michael told her there was nothing wrong with her head. The Rashid children also asserted that Ellen told Michael about the headaches. Namen also claimed that he told Kathleen about the headaches when he took Ellen to her.

Dr. Gundrum told Hayes that Ellen must have complained of a significant headache because he did a complete neurological exam. The July 13, 1983, emergency records tend to support Dr. Gundrum because they note that Ellen complained of a headache.

Finally, in addition to Brillman, several other doctors Hayes contacted later in the case all agreed that if Namen's version regarding this complaint was true, the CAT scan should have been ordered.

Given the factual information available to Hayes, we think the district court properly found that Hayes had reasonable grounds to believe such complaints had been made. The court, therefore, properly

concluded that Hayes had probable cause to continue the case.

The district court also found that the Wilsons had failed to prove Hayes continued the suit against them "out of ill-will, hatred, or for such other wrongful purpose as would constitute malice."

One issue the district court did not specifically address was the significance of Hayes' request for a release for himself during settlement negotiations. This bore on the question of malice or improper purpose. The Wilsons, however, did not file a rule 179(b) motion requesting the court to rule on this issue. So we deem it waived as to the malicious prosecution action. *See Cole v. First State Bank*, 463 N.W.2d 59, 63 (Iowa 1990) (Iowa Rule of Civil Procedure 179(b) motion essential to preservation of error when a trial court fails to resolve an issue).

However, this issue was raised and decided by the district court in the abuse of process action, which we next address. What we say there amply supports the district court's general finding of no malice or improper purpose in continuing the lawsuit for malicious prosecution purposes.

### B. *Abuse of process.*

■ Abuse of process is similar to malicious prosecution in that the basis for both is the improvident use of courts. Note, *A Lawyer's Duty to Reject Groundless Litigation*, 26 Wayne L.Rev. at 1565. The focus, however, is slightly different:

> Malicious prosecution occurs when an action is instituted without foundation. Conversely, abuse of process may be found when [legal process] is ... used to attain a collateral objective beyond that anticipated by the process. An ulterior motive does not alone satisfy the requirement for an action in abuse of process; a definite act or threat outside the process is required.

*Id.* at 1555–56; *see also Grell v. Poulsen*, 389 N.W.2d 661, 663 (Iowa 1986).

We have defined abuse of process as the use of " 'legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not de-

signed....' " *Schmidt v. Wilkinson*, 340 N.W.2d 282, 284 (Iowa 1983) (quoting Restatement (Second) of Torts § 682). The essence of this tort is an improper purpose for using the legal process. The improper purpose must result from " '[s]ome act or threat directed to an immediate objective not legitimate in the use of the process....' " *Id.* (quoting Restatement (Second) of Torts app. § 682 (1981)).

An improper purpose or use " 'is ordinarily an attempt to secure from another some collateral advantage not properly includable in the process itself....' " *Id.* at 284–85 (quoting *Sarvold*, 237 N.W.2d at 449). Simply put, the improper purpose relates to an extortion or coercion attempt by one person to do some other thing. *Id.* at 285.

■ An abuse of process can occur even though there is probable cause to bring the action and the original action terminates in favor of the plaintiff. *Sarvold v. Dodson*, 237 N.W.2d at 449.

■ Abuse of process has two elements: (1) legal process and (2) use of the legal process in an improper or unauthorized manner. *Tomash v. John Deere Indus. Equip. Co.*, 399 N.W.2d 387, 390 (Iowa 1987). A third element, while not specifically mentioned in our cases, requires that the plaintiff suffered damages as a result of the abuse. *See* 1 Am.Jur.2d *Abuse of Process* § 4, at 252 (1962).

The first element can generally be shown by the use of a legal process against the plaintiff. *See, e.g., Grell v. Poulsen*, 389 N.W.2d at 664; *Brody*, 267 N.W.2d at 905–06; *Sarvold*, 237 N.W.2d at 450.

The second element—improper motive in using the legal process—is more difficult to prove. The plaintiff must prove that the defendant used the legal process *primarily* for an impermissible or illegal motive. *Grell*, 389 N.W.2d at 663 (quoting with approval Restatement (Second) of Torts § 682 comment b). The significance of the word "primarily" is spelled out in Restatement (Second) of Torts, *Abuse of Process*, § 682 comment b:

*"Primarily."* [T]here is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant....

For abuse of process to occur there must be use of the process for an immediate purpose other than that for which it was designed and intended. The usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it.

*See Schmidt,* 340 N.W.2d at 284 (adopting comment b).

▇▇▇ In previous cases we have taken a very restrictive view of the primary purpose element. We have done so in the interest of protecting the right of ready access to courts. *Brody,* 267 N.W.2d at 905. So abuse of process will not lie for a civil action which inconveniences a defendant, or for one filed in expectation of settlement (a "nuisance" suit). *Id.* at 905–06. Additionally, there is no abuse of process when the action is filed to intimidate and embarrass a defendant knowing there is no entitlement to recover the full amount of damages sought. *Grell,* 389 N.W.2d at 664.

All of this is true as long as the act that is alleged to be improper, is in fact proper in the regular prosecution of the proceeding. *Id.* Put another way, "the defendant is not liable if he has done no more than carry the process to its authorized conclusion, even with bad intentions." *Schmidt,* 340 N.W.2d at 284 (citing with approval additional commentary found in Restatement (Second) of Torts app. § 682 (1981)).

▇▇▇ The Wilsons contend that Hayes had an improper or illegal motive for continuing the suit: to secure a release for himself which would avoid a suit against him. In support of their contention, the Wilsons argue that Hayes violated several ethical rules and these violations would supply the "primarily" improper motive.

Specifically, the Wilsons claim that Hayes' attempt to secure the release constituted a conflict of interest between Hayes and Namen. The Wilsons suggest that at a minimum Hayes should have told Namen about the conflict and should have advised Namen to consult with another attorney about it. *See* Iowa Code of Professional Responsibility for Lawyers EC 5–1 (lawyer should exercise professional judgment solely for benefit of client and not for the lawyer's personal interest); EC 5–2 (lawyer should not assume position that would tend to make lawyer's judgment less protective of client's interest); EC 5–11 (lawyer should recommend additional counsel when proper representation of client requires it).

The district court made no specific finding that Hayes committed any ethical violation, concluding that question was not a proper matter for it to decide. The court, however, did find that the proposed release constituted some evidence that Hayes continued the case to secure a collateral benefit. We seriously doubt whether the release request constitutes evidence of improper purpose for abuse of process purposes. Settlement is included in the "goals of proper process," even though the suit is frivolous. *Bickel v. Mackie,* 447 F.Supp. 1376, 1383 (N.D.Iowa), *aff'd,* 590 F.2d 341 (8th Cir.1978); *accord Brody v. Ruby,* 267 N.W.2d at 905–06.

The district court also found that Hayes continued to pursue the case in the district court and on appeal for legitimate reasons and not "primarily" to secure a release. We think there is substantial evidence to support these findings. Such evidence shows the following.

Once Hayes realized that the chances of a successful trial were minimal, he took immediate steps to settle. Namen was amenable to settlement for a very short time. Namen, however, quickly changed his mind and would not settle. Namen even threatened Hayes if Hayes did not continue with the suit. After Hayes made several unsuccessful attempts to convince Namen to settle, he sought and received

permission to withdraw from Michael's case.

As to the appeal in Kathleen's case, Hayes had reason to believe the appeal had merit. Hayes remained in the case to protect Namen in the event the appeal was successful. And, as he did in Michael's case, Hayes tried to convince Namen to dismiss the appeal. But Namen refused to do so. By this time the case was ready for oral argument. So Hayes did not seek withdrawal. However, once Hayes learned that Namen wanted to dismiss the appeal, as the district court found, Hayes took reasonable steps to dismiss it. Namen again would not cooperate, refusing to return the authorization to dismiss that Hayes had sent him.

The Wilsons seize upon Hayes' dismissal of Michael's case as evidence that he acted with an improper purpose in pursuing the appeal against Kathleen. The Wilsons contend that once Hayes sought dismissal of Michael's case he should have sought dismissal of Kathleen's case because her case was even weaker. We disagree.

The evidence suggests a reasonable explanation for the difference in treatment. To pursue Michael's case, Hayes would have had to expend much more time and expense than he would in pursuing the appeal. The appeal was ready to be argued. Minimal time and expense would be expended in prosecuting the appeal to the end.

If Hayes' primary purpose in continuing the appeal was to secure a release for himself, one might ask why did he seek a dismissal only in Michael's case? A dismissal of only one case would still subject him to the risk of suit.

There is one additional reason why the personal release request does not support a finding of abuse of legal process. The district court specifically found that "the discussion of a possible release for Hayes did not in fact obstruct settlement negotiations or prevent settlement." The court therefore concluded that such discussion "was not a proximate cause of any failure" to settle the malpractice suit.

We think the evidence also supports this finding and conclusion. Namen was only briefly amenable to settlement. This was right after his deposition. Thereafter the matter of settlement was a closed subject with him.

For all these reasons we conclude the judgment of the district court as to both claims must be affirmed.

III. *Issues on the Cross–Appeal.*

Because we are affirming the district court judgment we do not reach the issues Hayes raises in his cross-appeal.

IV. *Disposition.*

There was substantial evidence to support the district court's findings that the Wilsons had not proven their claims of malicious prosecution and abuse of process against Hayes. Accordingly, the district court correctly dismissed the Wilsons' petition, and we affirm its judgment in doing so.

AFFIRMED.

NEUMAN, J., takes no part.